# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SONIA KHALED, individually, and
GHASSAN KHALED, individually
and on behalf of S.K. and F.K., minors,

  Plaintiffs,         Case No. 14-14743

v.               Hon. Gerald E. Rosen

DEARBORN HEIGHTS POLICE
DEPARTMENT, CITY OF DEARBORN
HEIGHTS, and UNNAMED DEARBORN
HEIGHTS POLICE OFFICERS,

  Defendants.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ December 12, 2016 _____

PRESENT:  Honorable Gerald E. Rosen
     United States District Judge

## I.  INTRODUCTION

Plaintiffs Sonia Khaled and Ghassan Khaled, individually and on behalf of

Ghassan Khaled's minor daughters, S.K. and F.K., commenced this action in this

Court on December 16, 2014, asserting federal civil rights claims against the

Defendant City of Dearborn Heights, its police department, and unnamed Dearborn Heights police officers.[1]  The principal thrust of these claims is that Plaintiffs were provided substandard law enforcement services and were subjected to mistreatment and harassment due to their Arab descent and Muslim religion. This Court's subject matter jurisdiction rests upon Plaintiffs' assertion of claims under 42 U.S.C. § 1983 alleging violations of their right to equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution.  *See* 28 U.S.C. § 1331.

Through the present motion filed on October 23, 2015, Defendants seek an award of summary judgment in their favor as to each of the claims asserted against them in Plaintiffs' complaint.  In support of this motion, Defendants argue (i) that the Dearborn Heights Police Department was improperly named as a party because it is not a legal entity separate from the Defendant City; (ii) that Plaintiffs have failed to produce evidence of a municipal policy or custom that could support a claim against the Defendant City; (iii) that Plaintiffs' request to substitute named police officers for the John Doe defendants should be denied as made after an

---

[1]As discussed below, Plaintiffs have since identified two Dearborn Heights police officers, Sergeant Joanne Beedle Peer and Officer Michael Bacher, that they wish to name as parties in place of the John and Jane Doe defendants referenced in their complaint.

2

undue delay; and (iv) that, in any event, any claims against individual Dearborn Heights police officers cannot prevail over the defense of qualified immunity.

Defendants' motion has been fully briefed by the parties. Having reviewed the parties' briefs and their accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. As set forth below, the Court finds that this motion should be granted.

## II. FACTUAL BACKGROUND

Plaintiffs Sonia and Ghassan Khaled reside at 7450 Highview in Dearborn Heights, Michigan, along with Mr. Khaled's seven children from a prior marriage. Two of these children — a thirteen-year-old daughter, F.K., and a nine-year-old daughter, S.K. — also have been named as plaintiffs in this suit, and are represented in this litigation by Mr. Khaled.[2] Plaintiffs are Arab-Americans who

---

[2]Although the complaint indicates that Mr. and Mrs. Khaled are suing both on their own behalf and on behalf of Mr. Khaled's two daughters, Mr. Khaled testified at his deposition that he is representing only the interests of his daughters in this litigation, and that he and his wife are not seeking awards of damages on their own behalf. (*See* Plaintiff's Response, Ex. D, G. Khaled 6/18/2015 Dep. at 14, 43; Ex. E, G. Khaled

practice Islam.

In the early afternoon of December 6, 2014, one of Mr. Khaled's children called the Defendant Dearborn Heights Police Department to report an incident with Plaintiffs' next-door neighbor, Walter Solovey. (G. Khaled 6/18/2015 Dep. at 36.)[3]  Mr. Khaled testified that he was away from his home at the time, and that he received a call from one of his daughters reporting that Mr. Solovey had grabbed her two sisters by their arms, removed their head scarves, dragged them over to his property, and ordered them to pick up a piece of trash from his property. (G. Khaled 6/18/2015 Dep. at 35.)[4]  Upon receiving this call, Mr.

_____

9/23/2015 Dep. at 57.)

[3]Mr. Khaled testified that the incident in question occurred in August of 2014. (*See id.* at 34-35.)  Although the record indicates that Dearborn Heights police officers were summoned to Plaintiffs' residence on August 30, 2014 to investigate a report of trouble with a neighbor, (*see* Defendants' Motion, Ex. 4, 8/30/2014 Police Report), Plaintiffs state in their complaint that the initial incident giving rise to this suit occurred "[o]n or about December 6, 2014," (Amended Complaint at ¶ 14), and the relevant police report produced by Defendants likewise identifies the date of this incident as December 6, 2014, (*see* Defendants' Motion, Ex. 5, 12/6/2014 Police Report).

[4]Plaintiffs allege in their amended complaint that as Mr. Solovey grabbed the two girls, he referred to them as "f**king Arab Scarfies."  (Amended Complaint at ¶ 16.)  The amended complaint is captioned as "verified," and includes the verification of Mr. and Mrs. Khaled stating that the factual allegations set forth in the amended complaint are "true of our own knowledge, except those matters stated to be on information and belief, which we believe to be true."  (Amended Complaint, Verification at 1.)

So far as the record reveals, only Mr. Khaled has been deposed, and not Mrs. Khaled or the two minors named in the complaint.  As noted, Mr. Khaled testified that he was not at home to witness the alleged interaction between Mr. Solovey and his two

Khaled quickly returned to his residence.

In response to the call from Plaintiffs' home, Dearborn Heights Police Officer Michael Bacher reported to the scene. Officer Bacher testified that he was advised by dispatch to investigate a report of "[n]eighbor trouble," and that he was not told about any alleged assault of children. (Plaintiff's Response, Ex. C, Bacher Dep. at 14-15.) Similarly, Officer Bacher testified that upon arriving at Plaintiffs' residence and speaking to Mr. Khaled and his children, he learned only (i) that Mr. Khaled "had issues with the guy next door," who complained about Mr. Khaled's "kids being on his property" and told Mr. Khaled to "pick up [his] garbage," and (ii) that the children viewed the neighbor as "kind of a mean, crabby guy." (*Id.* at 16, 18.) According to Officer Bacher, nobody at Plaintiffs' residence told him that the neighbor had assaulted Mr. Khaled's daughters or called them a derogatory name. (*See id.* at 16-19.) Officer Bacher testified that after speaking to

_____

daughters. While a verified complaint may be treated as an affidavit for purposes of resolving a motion for summary judgment, this is true only if the verified complaint "satisfies the standards for affidavits set out in" Fed. R. Civ. P. 56, *Abdulhaseeb v. Calbone,* 600 F.3d 1301, 1311 (10th Cir. 2010) (internal quotation marks and citation omitted) — that is, if the statements in this pleading are "made on personal knowledge [and] set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4). Because Mr. Khaled, by his own admission, lacks personal knowledge of what Mr. Solovey might have said or done to his daughters on the date in question, and instead learned of this incident through the report of his daughter over the phone, the Court seemingly lacks any basis to treat the account of this incident in Plaintiffs' complaint as sworn testimony akin to statements in an affidavit.

5

the Khaled family, he went to Mr. Solovey's house and knocked on his door in an effort to "get his version" of what had transpired, but nobody answered and he concluded his investigation.  (*Id.* at 20.)[5]

Mr. Khaled has offered a somewhat different account of this incident.  He testified that upon returning to his home, a police officer had already arrived at the scene.  (*See* G. Khaled 6/18/2015 Dep. at 36-37.)  According to Mr. Khaled, after this unidentified officer investigated the incident, he told Mr. Khaled that he was "sorry about what happened," and he promised to obtain a "court order" or "search warrant" in order to enter Mr. Solovey's house and "pick him up."  (*Id.* at 37.)

Although Dearborn Heights police officers returned to Plaintiffs' home later that day, they did not do so in order to further investigate the incident between Mr. Solovey and Mr. Khaled's daughters.  Rather, according to Mr. Khaled:

> . . . .  Hours went by and I think it was around, I don't know, 5:00, 6:00 the same day I saw [Mr. Solovey] outside.  I said, did you touch my kids.  He said eff this, you Arab this.  He called a number.  I don't know who the hell he was calling.
>
> The [next] thing I know, I had seven, eight police cars, okay, in front of my house.  The one guy was not even wearing [a] uniform[],

---

[5]Mr. Solovey testified at his deposition that he was not home at the time of this incident.  (*See* Defendants' Motion, Ex. 9, Solovey Dep. at 27-28, 38.)  In addition, he denied that he has ever assaulted or even touched Mr. Khaled's daughters, whether on the date of this incident or at any other time, and he also denied that he called the girls "Arab scarfies."  (*See id.* at 8, 87.)

was wearing jeans and a shirt.  He said, you, Arab, come here.  Okay.
I said, are you talking to me?  He said, yeah, you come here.  I went
up to him, he said give me your license.  He swiped my license.  He
said, go back in the house.  I said, you guys are here to arrest
someone for what happened to my daughter[?]  He said, no, I'm here
to give you a ticket.  I said, ticket for what[?]  He said, for trash
because you put [out] your trash early.  I said, you're trying to tell me
you are here because of trash, you are not here for the guy who
grabbed my two daughters in the middle of the grass and called them
names and took their scarves[?]  He said, I don't want to hear it.

        I went into the house.  Ten minutes later . . . , I see two white
men, white guys walking [up to the house] and I swear, he said, here,
that's your ticket because you need to learn how the law work[s].  I
said, what is that ticket for?  He said, that's a ticket for trash because
you took the trash [out] early.  I said, are you serious[,] you are not
here to protect my babies and what happened to my babies[?]  All
this, you [are] here to give me a ticket?  He said, that's how it is, you
are Arab, you can learn how the law works . . . .

                                    * * * *

        I told him, this is a racist issue.  He looked at his friends.  He
said, look at this Arab, I don't want to hear your sh*t.  He walk[ed]
outside the house.

        . . . .  The only thing that happened next, I see th[at] whole
bunch of officers over at [Mr. Solovey's house].  He said, oh, you
know, now you guys — now you guys did a good job for me.

(*Id.* at 37-39.)  Plaintiffs have not identified any of the police officers involved in

this incident.

        Again, Defendants' account of this second incident is considerably

different.  According to a police report, Mr. Solovey called the Dearborn Heights

7

Police Department at around 5:40 p.m., complaining of trouble with his neighbor. (*See* Defendants' Motion, Ex. 6, 12/6/2014 Police Report.)  Upon arriving at the scene, the responding officers were approached by Mr. Solovey, who told them that Mr. Khaled had yelled obscenities at him while he was outside his home and had called him a "faggot." (*Id.* at 3.)[6]  The officers then spoke to Mr. Khaled, who stated that Mr. Solovey had called his daughter a "bitch" and that he had ongoing issues with his neighbor. (*Id.*)

According to the police report, the responding officers "observed garb[a]ge and furniture that was covering the whole lower half of [Mr. Khaled's] boulevard," so they issued him a ticket for an ordinance violation and advised him to remove the garbage until after 5:00 p.m. of the day before the next scheduled trash removal. (*Id.*)  In addition, because there had been multiple calls summoning police officers to address issues between Plaintiffs and Mr. Solovey, the two houses were placed on a "periodic check" list for police cars to occasionally drive by in an effort to keep the peace. (*See* Defendants' Motion, Ex. 10, Periodic

---

[6]Similarly, Mr. Solovey has testified that as he was walking a friend to his vehicle that afternoon, Mr. Khaled "stepped onto his front porch and started screaming f*ck you, you Polack fag[g]ot." (Solovey Dep. at 39.)  As this behavior continued, Mr. Solovey "felt threatened" and called the Dearborn Heights police. (*Id.*)  Mr. Solovey disputes Mr. Khaled's assertion that seven or eight police cars responded to this call, testifying that only two or three police cars arrived at the scene following his call. (*See id.* at 40.)

8

Check List; Ex. 11, Beedle Peer Dep. at 30-34.)[7]

The next day, Mr. Khaled's brother, Khaled Khaled, took Mr. Khaled's daughters to the Dearborn Heights police station and asked to file a report regarding the girls' alleged mistreatment by Mr. Solovey, but the officer on duty, Sergeant Joanne Beedle Peer, declined to take this report. (*See* G. Khaled 6/18/2015 Dep. at 41-42; Beedle Peer Dep. at 18.)  Sergeant Beedle Peer explained at her deposition that she was not allowed to take statements from minors without a parent or legal guardian present, and that she advised Mr. Khaled's brother of this rule when she denied his request to file a report. (*See* Beedle Peer Dep. at 18-19.)

Based on these incidents, Plaintiffs commenced this action against the City of Dearborn Heights, the Dearborn Heights Police Department, and unnamed Dearborn Heights police officers, alleging that these Defendants violated their right to equal protection under the Fourteenth Amendment to the U.S. Constitution

---

[7]Plaintiffs allege in their complaint that "[o]n a near daily basis, and as often as every thirty minutes, a Dearborn Heights Police Officer drives by Plaintiffs' home and shines the police vehicle's spotlight onto Plaintiffs' home, despite the fact that Plaintiffs have done nothing wrong." (Amended Complaint at ¶ 35; *see also* G. Khaled 6/18/2015 Dep. at 42.)  Defendants acknowledge that this is standard procedure for addresses on the periodic check list, but they state that the police ceased to shine spotlights on Plaintiffs' home after Mr. Khaled called to complain about this practice. (*See* Beedle Peer Dep. at 31-35.)

by treating them differently on account of their Arab descent and Muslim religion. Although Plaintiffs have not formally moved to substitute named police officers for the John and Jane Doe defendants referenced in their complaint, they ask in their response to Defendants' summary judgment motion that they be allowed to amend their complaint to join Officer Michael Bacher and Sergeant Joanne Beedle Peer as parties to this suit.

## III. <u>ANALYSIS</u>

### A. **The Standards Governing Defendants' Motion**

Through the present motion, the Defendant City of Dearborn Heights seeks an award of summary judgment in its favor on Plaintiffs' federal civil rights claims under 42 U.S.C. § 1983. In the event that Plaintiffs are permitted to substitute named Dearborn Heights police officers for the John and Jane Doe defendants referenced in their complaint, Defendants also seek an award of summary judgment in their favor as to the § 1983 claims asserted against these individuals, arguing that the officers are shielded from liability by the defense of qualified immunity. Finally, Defendants request that the Dearborn Heights Police Department be dismissed from this suit as lacking a legal existence independent of the Defendant City.

To the extent that Defendants have moved for summary judgment, the

10

pertinent Federal Rule provides that this relief should be awarded "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences."  *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007).  Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be

11

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

**B.    The Dearborn Heights Police Department Must Be Dismissed as an Improper Party to This Suit.**

Plaintiffs' complaint names both the City of Dearborn Heights and its Police Department as defendants. As Defendants correctly point out in their motion, however, the Sixth Circuit has consistently held that a municipal police department "is not a legal entity susceptible to suit" independent of its parent city. *Dean v. Landrum,* No. 99-6189, 2000 WL 922862, at *1 (6th Cir. June 27, 2000); *see also Matthews v. Jones,* 35 F.3d 1046, 1049 (6th Cir. 1994). Accordingly, it is "redundant" to name the Dearborn Heights Police Department as a separate defendant, *Damron v. Pfannes,* 785 F. Supp. 644, 646 (E.D. Mich. 1992), and the police department therefore must be dismissed as a party to this suit.[8]

---

[8]Plaintiffs evidently concede this point in their response to Defendants' motion, stating that it is merely a matter of "semantics" whether liability is imposed on the Defendant City or its police department. (Plaintiffs' Response Br. at 12.) Under these circumstances, the appropriate course of action would have been to agree that this aspect

12

**C.**     **Plaintiffs' Proposed Amendment of Their Complaint to Substitute Officer Bacher and Sergeant Beedle Peer for the John and Jane Doe Defendants Would Be Futile, Where There Is No Basis in the Record for Concluding that These Individuals Violated Plaintiffs' Constitutional Rights.**

Plaintiffs' initial and amended complaints do not name any individual Dearborn Heights police officers as defendants, but instead make reference at several points to unnamed police officers who allegedly participated in various activities that infringed upon Plaintiffs' Fourteenth Amendment right to equal protection.  As Defendants point out in their motion, if a plaintiff does not substitute named parties for John Doe defendants after being given a reasonable opportunity to identify and serve these individuals, then the claims asserted against these unnamed defendants are subject to dismissal.  *See Petty v. County of Franklin,* 478 F.3d 341, 345-46 (6th Cir. 2007); *Strauss v. City of Chicago,* 760 F.2d 765, 770 & n.6 (7th Cir. 1985).  Defendants suggest that this principle should apply here, where the discovery period has closed and Defendants have filed their present motion for summary judgment without any attempt by Plaintiffs to name any Dearborn Heights police officers in place of the John and Jane Doe defendants referenced in their complaint.

In an effort to avoid this result, Plaintiffs state in their response to

---

of Defendants' motion should be granted as unopposed.

13

Defendants' motion that they have now identified two of the Dearborn Heights police officers referenced in their complaint, and they seek leave to file a second amended complaint in which they would name these two individuals, Officer Michael Bacher and Sergeant Joanne Beedle Peer, as parties and specify the roles they played in the alleged violations of Plaintiffs' constitutional rights. Defendants oppose this request to amend on two grounds, arguing (i) that Plaintiffs did not act with sufficient promptness in seeking to name Officer Bacher and Sergeant Beedle Peer as additional parties, and (ii) that any such proposed amendment would be futile. The Court agrees as to the second point, and thus need not reach the issue of undue delay.

Turning first to Officer Bacher, Plaintiffs' proposed second amended complaint refers to this officer in only one of its allegations. Specifically, Plaintiffs allege (i) that Officer Bacher was dispatched to their home in response to their complaint that a neighbor had assaulted two of Mr. Khaled's daughters and called them "f**king Arab Scarfies," and (ii) that Officer Bacher's investigation of this matter consisted solely of "knock[ing] on the door of the neighbor" and "le[aving] after the neighbor did not answer the door." (Plaintiffs' Response, Ex. H, Proposed Second Amended Complaint at ¶ 18.) Similarly, Officer Bacher testified at his deposition that his involvement in the incidents giving rise to this

14

case was limited to an investigation in the early afternoon of December 6, 2014 of a report of "neighbor trouble" between the Khaled family and their neighbor, Mr. Solovey.  (Bacher Dep. at 14; *see also* Defendants' Motion, Ex. 5, 12/6/2014 Police Report.)

Neither the allegations of Plaintiffs' proposed amended complaint nor the evidence in the record would support a § 1983 claim against Officer Bacher, and it follows that it would serve no purpose to allow Plaintiffs to name this individual as an additional defendant in this suit.  As Defendants correctly observe, "[t]here is no statutory or common law right, much less a constitutional right," to an adequate police investigation.  *Mitchell v. McNeil,* 487 F.3d 374, 378 (6th Cir. 2007); *see also Poe v. Haydon,* 853 F.2d 418, 427 (6th Cir. 1988).  Even if Plaintiffs could overcome this obstacle, the sole theory of recovery advanced in their complaint, whether against Officer Bacher or any other defendant, is that they were subjected to discriminatory treatment on account of their ethnicity and/or religion.  Yet, Plaintiffs have produced no evidence whatsoever that Officer Bacher acted with unlawful motives — whether through consideration of Plaintiffs' ethnicity, their religion, or any other impermissible characteristic or factor — as he responded to Plaintiffs' call for police assistance and investigated their complaints of mistreatment by their neighbor.  Accordingly, Plaintiffs'

15

proposed § 1983 claims against Officer Bacher are fatally flawed, and there is no reason to grant leave for Plaintiffs to pursue these claims.

On essentially the same grounds, the Court finds that Plaintiffs' proposed amendment of their complaint to name Sergeant Beedle Peer as a defendant would likewise be futile. Once again, Plaintiffs' proposed second amended complaint makes only minimal reference to Sergeant Beedle Peer, alleging (i) that she is "believed to be" the individual at the Dearborn Heights police station who declined to take a report from Mr. Khaled's brother regarding Mr. Solovey's alleged assault of Mr. Khaled's daughters, and (ii) that this same individual who refused to take the report later visited Plaintiffs' home and told Plaintiffs "in [a] demeaning tone that she was there to make sure that Plaintiffs' garbage was taken out on the appropriate day." (Proposed Second Amended Complaint at ¶¶ 28-29.) Similarly, Sergeant Beedle Peer confirmed at her deposition (i) that she refused to take a report or statement from Mr. Khaled's brother regarding an incident at Plaintiffs' home involving Mr. Khaled's minor daughters, on the ground that such a report could not be made in the absence of the girls' parent or guardian, (*see* Beedle Peer Dep. at 18-19), and (ii) that either later that day or shortly thereafter, she was called to Plaintiffs' home as a supervising officer, and she instructed another officer on the scene to leave the premises after members of the Khaled

16

family started "screaming" at the officers and telling them to "get off their property," (*id.* at 21-25).

Beginning with the latter of these two encounters between Sergeant Beedle Peer and members of the Khaled family, Plaintiffs do not even mention this incident in their response to Defendants' motion, much less endeavor to explain how this incident might give rise to a § 1983 claim against Sergeant Beedle Peer. Accordingly, Plaintiffs are deemed to have abandoned any claim arising from this incident, and the Court need not address it any further.

As for Sergeant Beedle Peer's refusal to take a report from Mr. Khaled's brother on behalf of Mr. Khaled's two daughters, Plaintiffs once again have failed to identify any basis in the record for concluding that Sergeant Beedle Peer's actions on this occasion were motivated by impermissible considerations of Plaintiffs' ethnicity or religion.  To the contrary, Sergeant Beedle Peer has cited a neutral reason for acting as she did — namely, a departmental prohibition against taking statements or reports from minor children unless a parent or guardian is present, (*see* Beedle Peer Dep. at 18-19) — and Plaintiffs have not pointed to any evidence that might call this explanation into question.  Most notably, there is no evidence in the record that other minor children unaccompanied by a parent or guardian were allowed to lodge complaints with the Dearborn Heights police.

17

Consequently, just as there is no basis for concluding that Plaintiffs can state a viable § 1983 claim against Officer Bacher, the Court likewise finds that Plaintiffs' proposed amendment of their complaint to name Sergeant Beedle Peer as a defendant should be denied as futile.  Since these are the only two individuals that Plaintiffs have sought to name as additional defendants, it follows that Plaintiffs have failed to identify any basis for pursuing a § 1983 claim against any Dearborn Heights police officer in his or her individual capacity.[9]

**D.     Plaintiffs Have Failed to Identify a Viable Basis for Imposing Liability on the Defendant City Under 42 U.S.C. § 1983.**

Having resolved any claims that Plaintiffs might wish to pursue against individual Dearborn Heights police officers, the Court turns to Plaintiffs' effort to impose liability on the Defendant City of Dearborn Heights for alleged violations of their federal constitutional rights.  As recounted above, Plaintiffs' claims against the Defendant City and its police officers arise from three incidents

---

[9]In particular, while Plaintiffs complain of mistreatment by the Dearborn Heights police officers who came to their residence on the evening of December 6, 2014 and issued them a citation for putting their trash out too early, they have not identified any of the officers involved in this incident, nor have they sought to amend their complaint to name any of these officers as defendants.  Thus, the Court need not consider whether this incident might support the imposition of § 1983 liability upon any unnamed Dearborn Heights police officer in his or her individual capacity.  Moreover, the Court need not address Defendants' appeal to qualified immunity, in light of the Court's conclusion that Plaintiffs have failed as a matter of law to establish a violation of their constitutional right to equal protection by either Officer Bacher or Sergeant Beedle Peer.

18

occurring over a two-day period:  (i) the allegedly inadequate investigation of Plaintiffs' complaint that a neighbor had assaulted and made offensive remarks to Mr. Khaled's daughters, (ii) a return visit by unnamed Dearborn Heights police officers later that same day, during which the officers allegedly made additional offensive statements and issued a citation to Mr. Khaled for placing his trash at the curb too early, and (iii) the refusal of the Dearborn Heights police to take a report that Mr. Khaled's brother sought to make on behalf of Mr. Khaled's two daughters arising from the alleged assault of the girls by Plaintiffs' neighbor.[10]

Regarding the first and third of these incidents, the Court already has concluded that there is no evidentiary support for an equal protection claim against any individual officer arising from these encounters with the police.  It follows that the Defendant City cannot be charged with liability for these incidents.  *See*

---

[10]Plaintiffs also refer in their complaint to a subsequent encounter with the police, during which the officer who refused to take the report from Mr. Khaled's brother — evidently Sergeant Beedle Peer — visited Plaintiffs' home and spoke to Plaintiffs in a "demeaning tone" and one or more additional officers were heard making derogatory remarks about Arabs.  (Plaintiffs' Amended Complaint at ¶¶ 29-33.)  As discussed earlier, however, Plaintiffs do not address this incident in their response to Defendants' motion, so the Court finds that they have abandoned any claims arising from this incident. Likewise, to the extent that Plaintiffs might have sought to pursue claims arising from their allegations that they "continue to be specifically targeted and harassed by the Dearborn Heights Police Department" and that they are subjected to routine "monitoring and surveillance," (*id.* at ¶¶ 34-35), they are deemed to have abandoned these claims by failing to mention them, much less marshal any argument or evidence in support of these claims, in their response to Defendants' motion.

*Watkins v. City of Battle Creek,* 273 F.3d 682, 687 (6th Cir. 2001) (explaining that
"[i]f no constitutional violation by the individual defendants is established, the
municipal defendants cannot be held liable under § 1983").  Thus, the Court need
only address the second incident alleged in Plaintiffs' complaint — namely,
Plaintiffs' encounter with unnamed Dearborn Heights police officers on the
evening of December 6, 2014, during which Mr. Khaled was issued a citation for
taking out his trash too early.

Under well-settled principles, the Defendant City "cannot be held liable
under § 1983 for an injury inflicted solely by its employees or agents."  *Gregory v.
Shelby County,* 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Department of
Social Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978)).  Rather, "[f]or
liability to attach, there must be execution of a government's policy or custom
which results in a constitutional tort."  *Gregory,* 220 F.3d at 441.  Moreover,
Plaintiffs must establish that "through its deliberate conduct, the municipality was
the 'moving force' behind" the violation of their constitutional rights — that is,
they "must show that the municipal action was taken with the requisite degree of
culpability and must demonstrate a direct causal link between the municipal action
and the deprivation of federal rights."  *Gregory,* 220 F.3d at 442 (quoting *Board of
County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S. Ct. 1382,

1389 (1997)).

In this case, Plaintiffs seemingly propose three means of forging the requisite causal connection between municipal action and the alleged deprivation of their constitutional rights, but none of these is persuasive. First, Plaintiffs apparently suggest that a discriminatory municipal policy or practice may be inferred from the sheer number of Dearborn Heights police officers who made "racially charged statements" or otherwise "acted in a discriminatory manner toward Plaintiffs" during the incident in question. (Plaintiffs' Response Br. at 13-14.) In other words, while Plaintiffs recognize that "the wrongful conduct of a single officer without any policy-making authority d[oes] not establish municipal policy," *Collins v. City of Harker Heights,* 503 U.S. 115, 121, 112 S. Ct. 1061, 1066 (1992), they evidently maintain that the requisite policy or practice can be established through the "action[s] of numerous officers," (Plaintiffs' Response Br. at 14.) Yet, Plaintiffs have not cited any authority to support this notion that the actions of multiple officers can evidence municipal policy, nor have they suggested what sort of "critical mass" of officers is needed to move from the isolated conduct of one or a few individuals to conduct governed by a city-wide policy or practice.

Even assuming that the law recognized this principle, the record would not

permit its application here.  Not only have Plaintiffs failed to identify any of the officers involved in the incident in question, but they have produced no evidence from which a trier of fact could determine how many officers joined in the misconduct alleged by Plaintiffs.  The only account of this incident is found in the above-quoted deposition testimony of Mr. Khaled, (*see infra* at 6-7), and this testimony sheds no light whatsoever as to the number of officers who made "racially charged statements" or otherwise "acted in a discriminatory manner toward Plaintiffs," (Plaintiffs' Response Br. at 13).  Thus, whatever the "critical mass" might be that would transform individual misconduct into municipal policy, the trier of fact cannot be left to speculate whether this threshold has been met here.

Next, Plaintiffs suggest that the requisite municipal policy can be inferred from the testimony of three Dearborn Heights police officers that issuing a citation for a violation of the City's rubbish ordinance is rare, if not unprecedented.  (*See* Plaintiffs' Response, Ex. C, Bacher Dep. at 35-36; Ex. F, Beedle Peer Dep. at 7-8; Ex. G, Suggs Dep. at 12.)  Plaintiffs do not explain, however, why a rare or unprecedented action directed at them alone should be viewed as indicative of a city-wide policy or practice of ethnic or religious discrimination.  *Cf. Futernick v. Sumpter Township,* 78 F.3d 1051, 1056 (6th Cir. 1996) (explaining that "[t]he law

22

does not need to be enforced everywhere to be legitimately enforced somewhere"),
*overruled on other grounds by Village of Willowbrook v. Olech,* 528 U.S. 562, 120
S. Ct. 1073 (2000). To the contrary, it would seem that the municipal policy
posited by Plaintiffs would result in a pattern of garbage citations being issued to
other Arab or Muslim residents of the Defendant City, and not just Plaintiffs. Yet,
Plaintiffs have not even attempted to produce evidence of such a pattern of
selective enforcement of a municipal ordinance on discriminatory grounds. Nor
have they made (or attempted) a showing of the sort typically required to establish
a discriminatory practice — namely, that other, similarly situated City residents
who do not share their religion or ethnicity engaged in similar conduct but were
not issued citations for violating the City's rubbish ordinance.

Finally, Plaintiffs argue that the requisite municipal policy can be found in
the Defendant City's purported failure to properly investigate the incident at
Plaintiffs' home or take action against any police officers who engaged in
misconduct during this incident. Yet, while a mishandled investigation or
inadequate disciplinary measures can serve as evidence of a "policy, custom, or
practice . . . of condoning" wrongdoing by police officers, this evidence must be
accompanied by a showing "that the flaws in this particular investigation were
representative of (1) a clear and persistent pattern of illegal activity, (2) which the

23

[Defendant City] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the [City's] custom was the cause of" the particular misconduct committed in this case. *Thomas v. City of Chattanooga,* 398 F.3d 426, 432-33 (6th Cir. 2005).

Plaintiffs have not attempted any of these showings, and the record would not assist them in doing so. Most notably, as in *Thomas,* 398 F.3d at 433-34, there is no evidence here that the City engaged in a pattern of failing to investigate and take action in other instances of comparable police misconduct. Morever, Plaintiffs do not claim that they lodged a complaint with the City regarding the incident at their home on the evening of December 6, 2014, nor have they produced evidence that the City had notice of this incident. Indeed, Plaintiffs have not identified the officers involved in this incident, or even the number of officers who engaged in wrongdoing, so it is difficult to fault the City for inadequately investigating a police/citizen encounter as to which even the most basic details remain unknown. Accordingly, Plaintiffs have failed as a matter of law to establish a basis for imposing municipal liability on the Defendant City for any alleged violations of their federal constitutional rights.

Before leaving this matter, the Court wishes to emphasize that nothing in its rulings should be viewed as condoning the misconduct alleged in Plaintiffs'

24

complaint and identified in Mr. Khaled's deposition testimony.  The derogatory remarks cited in Plaintiffs' complaint cannot be tolerated, particularly if uttered by law enforcement officers who are pledged to serve all members of their community.  The Court trusts that the Defendant City and its police department will take seriously and thoroughly investigate complaints by Dearborn Heights residents of mistreatment based on race, ethnicity, religion, or any other protected characteristic.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' October 23, 2015 motion for summary judgment (docket #21) is GRANTED.

s/Gerald E. Rosen
United States District Judge

Dated:  December 12, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 12, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135

25